UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

GLORIA L. RODAS, *et al.*,  )
           Plaintiffs,  )
v.  )   No. 05 C 50105
SWEDISHAMERICAN HEALTH  )
SYSTEM CORPORATION, *et al.*  )
           Defendants.  )

## MEMORANDUM OPINION AND ORDER

FREDERICK J. KAPALA, District Judge:

Plaintiff, Gloria Rodas, individually and as administrator of the estate of the decedent infant Andrea Rodas, filed this lawsuit against defendants SwedishAmerican Health System Corporation ("SAH"), the United States of America, Dr. John Seidlin, and Dr. Ana-Maria Soleanicov, alleging medical negligence related to the delivery of the decedent on August 2, 2001. Defendants Seidlin and Soleanicov each have filed motions for summary judgment in which they argue that they are immune from liability based on the Illinois Good Samaritan Act, 745 ILCS 49/25. For the reasons stated below, the court grants defendants' motions for summary judgment.

### I. BACKGROUND[1]

On August 2, 2001, plaintiff went into labor with the decedent and was admitted to the labor and delivery floor at SAH at approximately 4:02 a.m. Up until that point, plaintiff had been

---

[1] The relevant background facts are taken from the parties' statements of undisputed facts, the responses thereto, and all accompanying materials, and in the event of a dispute, all reasonable inferences are drawn in favor of plaintiff.

receiving her prenatal care from the Crusader Central Clinic Association ("Crusader Clinic") and, therefore, did not have a primary physician. Plaintiff had been instructed, however, that for delivery services or other obstetric needs, she would be provided a physician at SAH. In addition to having an on-call family practitioner available at the hospital for its patients, Crusader Clinic also had an Agreement for Professional Services ("APS") with the University of Illinois College of Medicine at Rockford ("UIC"), whereby UIC obstetricians and gynecologists would provide back-up professional services to Crusader Clinic patients that were admitted to the labor and delivery floor at SAH. Dr. Soleanicov was the scheduled back-up obstetrician assigned to the labor and delivery floor on August 2, 2001.

Under the terms of the APS, Crusader Clinic agreed to pay UIC a set monthly fee regardless of the level of services provided. In exchange, Crusader Clinic reserved the right to bill its patients after receiving documentation of services rendered from the UIC physician, and Crusader Clinic was entitled to keep the entirety of the proceeds. As a result of this arrangement, UIC physicians did not directly bill patients to whom they provided back-up services or receive any additional compensation in the event they were asked to assist with a Crusader Clinic patient.

Plaintiff's care at SAH originally was managed by Dr. Al Saraf, a UIC resident, until approximately 7:00 a.m., at which time Dr. Alpa Boshku, a UIC resident, and Dr. William Baxter, a Crusader Clinic family practice physician, took over her care. During his deposition, Dr. Baxter testified that it was his understanding that day that if Dr. Soleanicov was not available to assist him, he could consult Dr. Seidlin if needed.[2] At approximately 12:05 p.m., Dr. Baxter asked a nurse to

---

[2] Dr. Soleanicov also testified that if Dr. Seidlin was physically present at the hospital, he would be available to "backup" or "fill in" for the on-call obstetrician or gynecologist. Although Dr. Seidlin disputes that there was any sort of agreement for him to provide backup to the on-call

2

contact Dr. Seidlin because the fetal heart tones had dropped, plaintiff was not pushing effectively, and there was no progress in the descent of the baby.[3]  Dr. Baxter did not attempt to contact Dr. Soleanicov, the scheduled back-up UIC physician, because he knew that she was in the middle of a surgery.

After Dr. Seidlin was notified about the status of plaintiff's labor, he determined that the infant should be delivered expeditiously (i.e., as soon as possible).  Because Dr. Soleanicov was the scheduled back-up doctor at the time, Dr. Seidlin immediately went to the operating room where she was located and advised her about plaintiff's condition and the fact that Dr. Baxter was requesting an obstetrician to consult and evaluate his patient.  After notifying Dr. Soleanicov, Dr. Seidlin was at plaintiff's bedside by 12:10 p.m.  Dr. Soleanicov was able to finish her surgery within five minutes or less, and she was at plaintiff's bedside by 12:15 p.m., at which point Dr. Soleanicov assumed control over the management of the delivery of the infant and made all of the decisions throughout the delivery of the infant.

After her arrival, Dr. Soleanicov looked at the fetal monitor tracings, did a vaginal and fundal exam, and ordered oxygen by mask and increased IV fluids, at which point the infant's condition improved slightly.  After approximately 10 minutes of pushing with plaintiff, however, the infant's

---

physicians and claims that he just happened to be at the hospital working in his office, for purposes of the motions for summary judgment, the court will assume this fact to be true because the evidence supports at a minimum a reasonable inference that there was an informal agreement whereby Dr. Seidlin could be consulted should the need arise and the scheduled on-call physician was unavailable.  In any event, this disputed issue is not material to the court's analysis in this case.

[3] Although not relevant to the claims of negligence in this case, it should be noted that Dr. Baxter previously had consulted with Dr. Seidlin at approximately 11:40 a.m. regarding treatment of plaintiff's pain with a pudendal block.  Dr. Seidlin was not asked to check on the patient at that time, however.

fetal heart rate decelerated down to 90, and Dr. Soleanicov decided to attempt an instrumental-assisted delivery. According to Dr. Soleanicov's deposition testimony, it was an "emergency situation" from the moment she walked into the room and, after spending some time with plaintiff, she knew that she had to "deliver this baby as soon as possible," and that "the fastest way and most expeditious way would be to attempt an instrumental delivery." After two unsuccessful attempts at delivery with a vacuum extractor, Dr. Soleanicov next attempted to deliver the infant with forceps. After Dr. Soleanicov was unsuccessful in her attempt at a forceps-assisted delivery, Dr. Seidlin indicated that he wanted to attempt an instrumental delivery. Dr. Soleanicov disagreed with this procedure and refused to let Dr. Seidlin attempt to deliver the infant. Instead, Dr. Soleanicov decided, at 12:35 p.m., to take plaintiff for a cesarian section because "it was becoming a serious emergency." Anesthesia was commenced at 12:40 p.m., and Dr. Seidlin was Dr. Soleanicov's assistant during the cesarean delivery because no one else was immediately available to assist. The infant was delivered at 12:50 p.m. According to the allegations in the complaint, the infant died on August 14, 2001.

For billing purposes, whenever a UIC physician provided services to a Crusader Clinic patient, a billing form listing the various diagnostic codes associated with the services performed would be prepared and submitted to the Crusader Clinic. For labor and deliveries, it is usually the delivery physician who handles the paperwork. On the billing form for plaintiff, Dr. Soleanicov circled the code "59515," which referred to "Cesarean delivery with postpartum care," and submitted this information to the Crusader Clinic's billing clerk. The form made no mention of an assistant, and Dr. Seidlin did not independently submit a billing form for his services. Based on the forms received, the billing clerk generated a "Hospital Encounter Route Sheet," which reflects,

4

among other things, Dr. Soleanicov's code number of 142, the same procedure code of 59515, and a charge of $1936.00. The billing clerk testified that this was the "standard rate" for that specific procedure code if the bill was to go to Public Aid.[4] The parties have failed to demonstrate to the court who determined the amount of this standard rate for this type of delivery. Moreover, the court notes that this amount appears to cover the entirety of plaintiff's labor and delivery, and therefore, seems to also include whatever charges were generated for the care plaintiff received both before and after Dr. Soleanicov's delivery services.

On August 23, 2001, Crusader Clinic issued a bill to a third-party payer, Medicaid, in the amount of $1936.00 for the delivery services provided to plaintiff. Plaintiff's account history next reflects a "Medicaid write-off" in the amount of $803.00, as well as a payment by Medicaid to Crusader Clinic for the remaining balance of $1133.00. Because the Crusader Clinic was entitled to collect on the bill and keep the entirety of the proceeds according to the terms of the APS, plaintiff was never billed directly from UIC, Dr. Seidlin, or Dr. Soleanicov for their delivery services. Moreover, Dr. Seidlin and Dr. Soleanicov each received their full salary and compensation from UIC that day, and this amount would have been the same regardless of whether they provided any professional services to plaintiff.

## II. DISCUSSION

In their motions for summary judgment, both Dr. Seidlin and Dr. Soleanicov argue that they are entitled to immunity from plaintiff's claims of medical negligence pursuant to the Illinois Good Samaritan Act, 745 ILCS 49/25. In order to decide these motions, which depend on an interpretation

---

[4] The billing clerk testified that, during 2001, the standard billing rate for a Cesarean delivery with postpartum care if billed to private insurance was "around $3,000."

of state law, the court must predict how the Illinois Supreme Court would decide this case if it were presented to it. See Konradi v. United States, 919 F.2d 1207, 1213 (7th Cir. 1990). When, as here, there are no decisions on point from the state's highest court, the "decisions of the state appellate courts control, unless there are persuasive indications that the state supreme court would decide the issue differently." Allstate Ins. Co. v. Tozer, 392 F.3d 950, 952 (7th Cir. 2004) (quotation marks omitted); see also Liberty Mut. Fire Ins. Co. v. Statewide Ins. Co., 352 F.3d 1098, 1100 (7th Cir. 2003) (explaining that, when applying state law, "the rulings of state appellate courts must be accorded great weight, unless there are persuasive indications that the state's highest court would decide the case differently" (quotation marks omitted)).

The Illinois Good Samaritan Act provides, in relevant part, that a licensed physician "who, in good faith, provides emergency care without fee to a person, shall not, as a result of his or her acts or omissions, except willful or wanton misconduct on the part of the person, in providing the care, be liable for civil damages." 745 ILCS 49/25. The Act's stated purpose is to provide "numerous protections for the generous and compassionate acts of [Illinois] citizens who volunteer their time and talents to help others," and its provisions are to be "liberally construed to encourage persons to volunteer their time and talents." 745 ILCS 49/2.

Illinois courts require a doctor seeking to invoke the protections of the Good Samaritan Act to prove two things: "(1) that he or she provided emergency care and (2) that he or she did not charge a fee." Estate of Heanue v. Edgcomb, 355 Ill. App. 3d 645, 648 (2005). The Act also requires that the doctor act "in good faith." See id. The Act applies even where the emergency occurs within a hospital. See Johnson v. Matviuw, 176 Ill. App. 3d 907, 917 (1988). In addition, a doctor does not have to prove the absence of a preexisting duty to render aid to the patient in order

6

to receive the protections of the Act. Neal v. Yang, 352 Ill. App. 3d 820, 829 (2004). Thus, even a physician who is "on-call" and has a duty to provide aid can be immunized under the Act. Id.; see also Heanue, 355 Ill. App. 3d at 648.

A. Emergency Care

Illinois courts utilize a "flexible broad definition" to determine what constitutes an "emergency" for purposes of the Good Samaritan Act and have stated: "whether an emergency situation exists is to be resolved based on the unforeseen, unexpected combination of circumstances presented which require the need for immediate action, assistance, or relief." Rivera v. Arana, 322 Ill. App. 3d 641, 651 (2001). In this case, there is no genuine issue of material fact as to this issue, and the court concludes as a matter of law that Dr. Seidlin and Dr. Soleanicov provided emergency care when they were asked to assist with the delivery of the decedent by Dr. Baxter. First, neither doctor had ever seen plaintiff as a patient and the need for services from a UIC physician was completely unforeseen and unexpected. Second, the parties agree that Crusader Clinic physicians generally would not contact the UIC back-up physicians unless there was an emergency or serious problems or complications with a patient. Finally, the evidence in the record, including the deposition testimony of Dr. Seidlin and Dr. Soleanicov, as well as the allegations in plaintiff's complaint, all suggest that this was an emergency situation that required immediate action and assistance. Given all these factors, the court concludes that defendants provided plaintiff with emergency care, and no reasonable jury could conclude otherwise.[5]

---

[5] Plaintiff argues, with respect to Dr. Seidlin only, that there was no emergency given that he first contacted Dr. Soleanicov rather than immediately providing care to plaintiff, and because he allegedly waited at plaintiff's bedside until Dr. Soleanicov arrived without performing any services. This argument is self-defeating, however. If there was no emergency situation, then plaintiff's only claims of negligence against Dr. Seidlin for failing to act sooner would necessarily

7

B. Without Fee

The crux of the dispute between the parties as to the applicability of the Good Samaritan Act is whether Dr. Seidlin and Dr. Soleanicov provided their services to plaintiff "without fee." Defendants urge this court to follow the approach taken by several Illinois appellate court cases, which have concluded that the plain meaning of the word "fee" refers to "a very specific sort of relationship where the economic benefit is derived directly from the service performed." Heanue, 355 Ill. App. 3d at 649. Under this approach, the Illinois courts have found that a "fee" does not include situations in which the doctor only receives some sort of indirect economic benefit from his services. See id. at 649-50 ("The legislature could have easily said that the immunity conferred by section 25 is available to those who provide emergency care without deriving any economic benefits, but it did not. It specifically chose the term 'fee.'"). Thus, these courts have found that immunity under the Good Samaritan Act applies "except where a doctor charges a fee specifically for the services at issue." Heanue, 355 Ill. App. 3d at 649-50; see also Rivera, 322 Ill. App. 3d at 648-49 (affirming summary judgment and trial court's decision that services were rendered gratuitously and without fee because "[the doctor] sent no bill, no bill was received and, more importantly, [the doctor] was paid nothing"); Villamil v. Benages, 257 Ill. App. 3d 81, 92 (1993) (concluding that the doctor had provided services without fee and "the fact that no bill was ever sent or payment provided [was] controlling on this issue").[6]

---

fail. See Somoye v. Klein, 349 Ill. App. 3d 209, 216 (2004) ("If no emergency situation existed, plaintiffs' underlying negligence claim fails regardless of the effect of section 25 of the Act because the claim alleges a negligent failure to act . . . .").

[6] Although not directly applicable here, Illinois courts also recognize that the doctor's intent to bill is irrelevant and have applied the Act even where there was some evidence indicating an intent to bill the patient. See Rivera, 322 Ill. App. 3d at 648 ("[W]hatever Dr. Arana's intentions

The Heanue case from the Illinois appellate court provides the most recent example of this plain language approach to the Good Samaritan Act. In Heanue, the decedent underwent a surgical procedure that was performed by Dr. Whitman, a partner in the defendant Rockford Surgical Service, S.C. Heanue, 355 Ill. App. 3d at 646. Following the surgery, the decedent began having problems with her medication and a nurse tried to page Dr. Whitman, but he was not available. Id. Thereafter, the nurse contacted Rockford Surgical and the defendant, another doctor with that practice group, was sent over to the hospital and took over treatment of the decedent. Id. The defendant doctor did not bill the patient specifically for his services. Id. at 647. Under these circumstances, the court concluded that, even if the defendant benefitted financially from Rockford Surgical doing business with the decedent, that indirect economic benefit "does not constitute charging a fee for services as contemplated by the Act." Id. at 648-49.

On the other side, plaintiff (and the United States, which filed a response in opposition to defendants' motions for summary judgment) argues that this court should follow Henslee v. Provena Hospitals, 373 F. Supp. 2d 802 (N.D. Ill. 2005), a case out of the Northern District of Illinois. In Henslee, Dr. Walter Drubka, one of the defendants who provided emergency care to the decedent, worked as a physician at the Provena Immediate Care Center. Id. at 804-05. Dr. Drubka was paid on a per diem basis and did not bill his patients directly. Id. at 804. When the decedent arrived at the Care Center with her husband, she was unconscious, and Dr. Drubka treated her in the parking lot while waiting for the paramedics to arrive. Id. at 804-05. The decedent never received a bill from the Care Center for Dr. Drubka's services, but Dr. Drubka was paid for his time working at the

---

were with respect to possible billing in the future for his services, they are irrelevant."); Villamil, 257 Ill. App. 3d at 92 (finding that evidence of intent to bill in the future by sending a request for plaintiff's public aid number was "a red herring" because "the statute mentions nothing of intent").

9

Care Center that day. Id. at 805.

In Henslee, Dr. Drubka moved for summary judgment, arguing that he was immune from any liability based on the Illinois Good Samaritan Act. Id. at 806. In reviewing the statute, the court rejected the Illinois courts' plain language approach and found that the phrase "without fee" was ambiguous. Id. at 812. After trying to discern the intent of the legislature, reviewing the current state of medical practice, and discussing public policy considerations, see generally id. at 812-15, the court concluded that a broader definition of "fee" was required, one which would "include both the doctor's compensation and the patient's eventual payment," id. at 814. Based on this definition, the Henslee court concluded that defendant was not entitled to immunity under the Act because, even though he did not charge a specific fee for his services, he was paid his normal compensation for services rendered within the scope of his employment. Id. at 815.

Illinois courts have not yet had an opportunity to address the approach taken by the court in Henslee, although the case was discussed in some detail in Muno v. Condell Medical Center, 383 Ill. App. 3d 688 (2008). In that case, the Illinois appellate court summarized both the interpretation of the "without fee" provision advocated by the Henslee court (and the plaintiff in Muno), as well as the statutory interpretation arguments raised by the defendants in contradiction to the Henslee approach. See id. at 689-92. The court noted that "[b]oth sides of this dispute have raised persuasive points that Illinois courts apparently have yet to consider," but ultimately decided that it was appropriate to "leave the resolution of this dispute for another day." Id. at 692.

After considering these competing interpretations of the "without fee" provision in the Illinois Good Samaritan Act, the court finds it proper to the follow the approach that has been consistently taken by the Illinois appellate courts, especially given that these decisions are supposed

to be controlling when interpreting Illinois law "unless there are persuasive indications that the state supreme court would decide the issue differently." Tozer, 392 F.3d at 952. Here, there is no indication that the Illinois Supreme Court, if faced with this issue, would decide to go against a long line of authority from the Illinois appellate courts that have relied on the plain meaning of the word "fee" in favor of a statutory interpretation that has been suggested by a single district court and has, to date, not been followed or adopted by any other court.

Moreover, as outlined in Muno, although the arguments behind the Henslee approach are persuasive, there are equally persuasive counter-arguments which suggest that, even if a court were to engage in a statutory interpretation analysis, the word "fee" as used in the Good Samaritan Act does not encompass all situations in which a doctor receives any type of compensation. See Muno, 383 Ill. App. 3d at 691 (noting other sections of the Act that differentiate between "fee" and "compensation").

Finally, because the facts in Henslee are distinguishable from the facts of this case, the chance that the Illinois Supreme Court would be persuaded by the Henslee approach is somewhat limited. Specifically, while Dr. Drubka was paid on a per diem basis and his primary job responsibility was to care for any patient that came to the Immediate Care Center, in the instant case, Dr. Seidlin and Dr. Soleanicov were paid an annual salary that would have been the same regardless of whether they were working that day, and although they may have had a duty to provide back-up professional services to a Crusader Clinic patient if the need arose, this was not their primary function or job responsibility. For all these reasons, the court concludes that it is appropriate to follow the Illinois appellate court approach to the interpretation of the Good Samaritan Act.

Under the Illinois appellate court approach, both Dr. Seidlin and Dr. Soleanicov are entitled

to immunity under the Good Samaritan Act because neither doctor billed plaintiff for their services rendered or received an economic benefit that was derived directly from the services performed. Moreover, the fact that Dr. Soleanicov submitted a billing form to Crusader Clinic indicating what services were performed does not alter this analysis. There is no evidence that Dr. Soleanicov had any input in determining what fee would be charged for her services, and in fact, the evidence reflects that the $1936.00 charge was the "standard rate" for the type of delivery performed for patients on Medicaid. This suggests that the rate may have been lower than Dr. Soleanicov's customary charge for the type of service performed. Additionally, it appears that this rate encompassed the entirety of plaintiff's labor and delivery, and therefore was not tied specifically to Dr. Soleanicov's emergency services, but may have also included charges for the pre-emergency services of Dr. Baxter and any post-delivery care. See Heanue, 355 Ill. App. 3d at 648-49 (concluding that the defendant's services were done "without fee" even though the patient was billed for services rendered before and after the emergency care). Finally, because Crusader Clinic had the exclusive right to bill its patients and retain whatever proceeds may have been generated from those bills, and because neither Dr. Seidlin, Dr. Soleanicov, nor UIC received any additional compensation based on their encounter with plaintiff, it would be difficult to conclude that either doctor received a "fee" for their services.[7] Put simply, a doctor's act of submitting documentation of the services rendered to the billing department for Crusader Clinic differs drastically from, and does not equate with, what the Illinois appellate courts consider charging a "fee" for purposes of the

---

[7] The fact that Dr. Seidlin failed to submit any documentation indicating his role in the care of plaintiff tends to further demonstrate that Dr. Seidlin provided care "without fee," but, ultimately, this fact is irrelevant because the submission of a billing form to Crusader Clinic does not alter this court's analysis.

Good Samaritan Act. Because defendants never issued a bill or charged a fee to plaintiff, and because they were never directly paid for their services rendered, the court concludes that defendants provided care to plaintiff "without fee."

C. Good Faith

A final requirement of the Good Samaritan Act is that the physician's actions be done "in good faith." The court in Heanue noted that this provision modifies both the "provides emergency care" and "without fee" requirements, and cautioned that "[r]efraining from charging a fee simply to invoke the protection of section 25 would seem to violate the requirement that the doctor's actions be taken in good faith." Heanue, 355 Ill. App. 3d at 650.

In her responses to the motions for summary judgment, plaintiff argues that both motions should be denied because neither Dr. Seidlin nor Dr. Soleanicov can show that they met the good faith requirement. The court finds these arguments to be without merit as there is no evidence in the record to suggest, let alone prove to a jury, that defendants' actions were done in an attempt to garner immunity or otherwise were taken in bad faith. Dr. Seidlin and Dr. Soleanicov properly responded to a request for assistance in an emergency situation and, for purposes of billing, notified Crusader Clinic of the services rendered in compliance with the terms of the APS.[8] Plaintiff's arguments seem to suggest that, in order for the good faith requirement to be met, the physician must

---

[8] Plaintiff argues, with respect to Dr. Seidlin, that there is no evidence that his failure to submit a billing form to Crusader Clinic was anything more than mere oversight. This does not matter because, as discussed above, Dr. Seidlin would be entitled to immunity even if he had properly documented the services he performed. Therefore, the failure to submit a billing form cannot be viewed as an attempt to merely invoke the protections of the Good Samaritan Act. See Heanue, 355 Ill. App. 3d at 650.

13

act with nothing but pure altruistic intentions.[9] There is nothing in the statute or case law to support such a drastic reading of the good faith requirement and the court declines to impose one. Accordingly, the court concludes that there is no genuine issue of material fact with respect to the good faith requirement of the Good Samaritan Act.

### III. CONCLUSION

Based on the foregoing, the court concludes that both Dr. Seidlin and Dr. Soleanicov are entitled to immunity under the Illinois Good Samaritan Act and, as a result, grants their motions for summary judgment.[10]

Date: January 29, 2009                                         ENTER:

                                                                  _____
                                                                  FREDERICK J. KAPALA
                                                                  District Judge

---

[9] For example, plaintiff argues, with respect to Dr. Soleanicov, that "the likely reason neither UIC nor [Soleanicov] issued a bill is they were acting in accord with the APS, which reserved the right to Crusader to bill," and that "her response to a request for an evaluation is the likely reason she went to [plaintiff's] bedside." The fact that Dr. Soleanicov was acting in accordance with the terms of the APS does not in any way show that her actions were done in anything but good faith.

[10] Dr. Seidlin and plaintiff each filed a motion to strike certain portions of the other side's pleadings. Because the court did not rely on any of the portions that were objected to in deciding the motions for summary judgment, the court need not resolve these disputes and the motions to strike are denied as moot.